Move to our fourth case for argument, Rachwalski v. Blanche. Just wait one minute before she gets ready and ready to start. Okay, Mr. Wright. Thank you. May it please the court, Jeremy Wright on behalf of plaintiff appellant Alexis Rachwalski. We ask that the court reverse the summary judgment entered by the district court. I'd like to focus primarily on the constructive discharge claim that was at issue in this case that was not analyzed properly by the district court. The district court utilized the wrong test in looking at the constructive discharge claim and also did not consider all of the evidence in ruling on that claim. Before we dive into those, I want to make sure are we not raising the sex discrimination, the retaliation or the disability discrimination? The retaliation claim is not raised and the disability claim is not raised. Okay. We are focused on sex discrimination as the basis for the retaliation. I'm sorry, as the basis for the hostile work environment and the constructive. Okay. And the constructive discharge. Thank you. Yes, Your Honor. So the question is, ultimately, first, I don't know that there's a disagreement between parties that the district court utilized the wrong test in looking at the constructive discharge claim. This court has held quite clearly there's two different types of analysis of the constructive discharge claim and the district court utilized the wrong test. Isn't your argument, though, that the district court didn't analyze whether or not she suffered an adverse employment action? But the district court just assumed that. So I don't know what difference that makes. I'm having a hard time figuring out what difference that makes. Because that's not what the district court didn't decide the case at all on whether or not she suffered an adverse employment action. That's correct, Your Honor. The court did consider whether there was an adverse action here. The problem in utilizing the wrong legal test was a failure to account for all of the evidence that would go into the correct legal test. How so? It comes down, ultimately, to pretext. Under McDonnell Douglas, there is an explanation that's asserted here by defendants for the decision to force the plaintiff into resigning her position. What's the evidence that they lied? What's the evidence that any of this had to do with her sex? Well, it goes to the inherent fishiness of the explanation. What does that have to do with her sex? What evidence do you have that she was terminated or constructively discharged because she was a female? Because of the way it was handled, because of the rush to press her into resigning. Again, the way it was handled or the rush, what does that have to do with sex? That could equally happen to a man. It could. It didn't. So what? You brought a sex discrimination claim. Not just a general claim of bad employment practices by the FBI. In the whole context here of all of the evidence, she was clearly treated differently than others. Who was? Than who? Yeah, you need to have a comparator. You don't. Well, there's not a direct comparator with the exact same set of facts, but what there is is her supervisor sending somebody else to talk to her because of her sex about her atomic female. But that's not an adverse employment action. No, it is not. It would just be professional courtesy. It is evidence of the context and the way that the supervisors were treating her and treating her in a different manner because of her sex. But isn't it undisputed that she disclosed that highly confidential information inappropriately? That's undisputed, correct? No, Your Honor. It is not. That she didn't tell at a social gathering non-FBI people of highly confidential information about an applicant? No, Your Honor. There is no evidence in the record that she disclosed any information to anybody who was not an FBI official. And there is no evidence that she disclosed anything after that social gathering that was not already known to the people she was talking to. Could she disclose that to other FBI agents, her views of a candidate? The defendants have not asserted that it was improper for her to do so months before when she conducted the background interview of this candidate. Could she discuss, I'm going to ask my question again, is whether or not she discussed this information concerning a candidate at the Christmas party. And so was that against the confidentiality requirements for being a part of the hiring committee? No. It was not, Your Honor. The defendants point to the employment agreement language about disclosure that the plaintiff signed upon joining the FBI. This says you can't disclose this. It says you can disclose it? It says you cannot disclose any information that you receive in your duties to any unauthorized recipient. Other FBI agents that she's working with are not unauthorized officials. It's taking one step back. So if you interview, if you're participating in an interview, I want to make sure I follow this argument to its logical end, is that if you're on the hiring committee, when you walk out of the hiring interview, you get to share with everyone on staff what happened in there? What happened in this case, Your Honor, is before. That's great, but I'm really talking about the hypothetical. I need you to engage with the hypothetical. Is that what you're wanting us to hold, is that we should decide as to who you get to disclose information that you receive from hiring when you're serving on a hiring committee? I need us to engage with the hypothetical so that when we're writing the opinion, we're able to put the limiting principle around it. Yes, Your Honor. I guess I'm struggling a bit with hypothetical because it is a different situation than what happened. That's why it's a hypo. I understand. If it is confidential information that you gain, that you are allowed to share with an official, another official, then it's not an unauthorized disclosure. Okay. So the hiccup or the line here is unauthorized. And so the argument is that unauthorized would have been someone outside of who was invited to the party. Who, yes. And I think that defendants have conceded that it was okay for her to disclose that information because at the time of the security interview, when she learned this disturbing information about John Doe, the applicant, she did not know what to do with that information. She was a relatively new agent at that time. She sought out counsel of her more experienced agents on staff to help guide her. At the Christmas party? Pardon? At the Christmas party? No, months before.  Like nine months before. She went to people and said, I was in an interview. I learned some very disturbing information. How do I document this? What do I do to make sure that this goes through the process correctly? She then, after the party, went back to those exact same people and said, I want to go back in time and make sure I did everything correctly because I now know that John Doe was hired. And that disturbs me because I think maybe I messed up. But that's a different factual scenario than what happened here. She didn't wait to go to her supervisors and say, I had some concerns. Wasn't there conversation shared at the Christmas party when she saw the candidate? The candidate shared information. She did not. The candidate came up to her and said, oh, great to see you. Guess what? You did my background interview, and I got hired in front of everybody. That was information he provided, not that she provided. All right, Mr. Wright, you're in rebuttal time here. Let's see what Ms. Gregory has to say about this, and then we'll come back to you for rebuttal. Good morning. May it please the court, Amanda Gregory representing Todd Blanche and Kash Patel in their official capacities. First, I want to clarify something because I feel like my friend on the other side has misstated the record to some extent. So based solely on the admissions that Ms. Rukwalski has made, in December 2020, immediately after she did the interview of John Doe, she disclosed the derogatory information to two special agents who were on her squad. That's Special Agents Argo and Pakala. Then later, in August 2021, after the party, she again disclosed the information or she repeated the information again to those same two agents, Argo and Pakala, but then she told for the first time the information to three more FBI personnel, so Special Agent Podwoski, an intelligence analyst, Mark, and then Supervisory Special Agent LaBuzz. And in one of her filings in the EEOC matter— This is after the part. Yes. Okay, I got it now. She also stated or she admitted that she told her non-FBI fiance as well. And my friend on the other side's reply characterized that admission in a filing is not evidence in the record, but for summary judgment purposes, you can take into consideration all admissions on file. This filing from her legal counsel would clearly count as an admission, so she has admitted that she told her non-FBI fiance as well. And it's not just that she said, there's a problem, I'm concerned this person is hired. She disclosed the derogatory information. If she was just getting advice to try to see how she should follow up about something, she wouldn't have to disclose the specifics of the derogatory information. FBI made the decision to terminate her because she had mishandled the confidential information in violation of both FBI policy and the Privacy Act. So what is confidential? You said derogatory. Now we're using the word confidential. Well, anything in the interview would be confidential. Derogatory is, I mean, I guess confidential is more important, but here I think the derogatory comes into play too because of the seriousness of the disclosure. Okay. I think it's important, our language is important, because confidentiality holds a different connotation than derogatory. And so if we're going to suggest that she disclosed confidential derogatory information, is that the contention? Yes, it is both. It is both.  She now claims that her sex was a factor in the determination, but as the district court found, she did not produce evidence that would cause a reasonable fact finder to find a causal connection between her sex and her forced resignation. There's no evidence that the decision maker in this case, Special Agent in Charge Paul Keenan, acted with a discriminatory motive. Indeed, the uncontested evidence shows that he believed, based on credible internal reports, including one from Supervisor LaBuz, that Rekwalski had gossiped about the information, that she wasn't just disclosing it to seek advice, but that she believed that she was laughing about it, and that she was mocking others so that they could laugh about it as well. There's no evidence of dishonesty, of shifting explanations, or discriminatory motive. There is no evidence of a male employee making a similar unauthorized disclosure and being treated more favorably. And at most, she's challenging the correctness of FBI's decision, but this court has said time and time again that it is not a super-personnel department. I did want to address, to some extent, an issue raised in Appellant's reply and underlying the whole fishiness argument, and it's this idea of this formal investigation. There's no requirement for a formal investigation, and there was no formal investigation in terms of someone being assigned to investigate, sitting down and interviewing people and writing up reports on that interview. But the supervisors gathered information from relevant personnel, documented their concerns, and elevated the matter both to the head of the office, the decision-maker, and to headquarters as required, and all that is standard and acceptable. In the assistant special agent in charge's sworn statement, he said that he had personal conversations with employees that he believed he had received the information from the barbecue. Specifically, he says he spoke to four different agents, and three of them told him that Repulski had discussed the information at the barbecue. So while that's not a formal investigation, that is doing follow-up. And again, what matters here is not what the actual disclosure was, but what the decision-maker reasonably believed. For these reasons, we think you should affirm the district court. If there are no further questions, I'll yield the remainder of my time. Okay, thank you, Ms. Gregory. Thank you. Okay, Mr. Wright, we'll give you a minute for rebuttal. Thank you, Your Honor. Just quickly, the question ultimately is, could a reasonable jury find that this explanation was pretext for discrimination? The inherent fishiness in the decision here to, without asking her a single question, tell her we're going to terminate you for something that we think you did wrong, that she did not do, is inherently fishy and can support a finding of pretext. But isn't there a 10-page memo? I'm looking at it. It lists going through a lot of issues with her performance. And she was in her probationary period, correct? Correct. And there was the FBI party. There was sort of maybe an aggressive tone in an email about the dress code policy. There was a request for telework. I mean, there were several things that led up to this memo recommending termination, right? That I don't see have anything to do with sex. Well, the memo about the attire was all about her sex, actually. But beyond that, that memo was not. Why do you say that, though? Because I understand that we have said it doesn't matter who says it, but that complaint about her dress came from a female supervisor. I know that's not dispositive. Same sex can discriminate, too. But, you know, not wearing tennis shoes and a baseball cap and a T-shirt to work, that's not sex. Counsel someone on that. It's not sex discrimination. The way that it was handled was sex discrimination. She was dressed differently. Again, her supervisor sent a female subordinate to go. It was the female subordinate who flagged the issue. Matson, no? She flagged the issue. And she raised it to Brooks, and Brooks says, You talk to her. Maybe he just didn't want to deal with it. What does that have to do with sex? I think Brooks testified that he sent her because he thought it would be more comfortable coming from a woman than coming from a man because of her sex. And what a plaintiff did in response is she went to Brooks and said, Can you show me a policy? Because I'd like to make sure that I'm complying with some policy, and sent an email that he took offense to. Again, we believe that that was related to her sex and is evidence of sex bias against her from the supervisor who later then cooperated in developing this memo that was used to terminate or threaten termination of the plaintiff. All right. Thank you, Mr. Wright. Thank you. We'll take a case under advisement.